My name is Steve Shadowin. I represent plaintiffs Rite Aid and CVS, and I'm speaking this morning on behalf of all of the plaintiffs' appellants. I'd like to reserve two minutes for rebuttal. That's granted. You may need more time for rebuttal, but we'll worry about that. Thank you. You're on our time, by the way, gentlemen. You can go over to the red light. Okay. We'll stop you when we're ready. You'll let me know when you've had enough. Yeah, well, you can go. I mean, it's the government we want to hear. Okay. Your Honors, a payment by a brand-name manufacturer to a generic manufacturer to... Speak into the mic, please. A payment by a brand-name manufacturer to a generic manufacturer to withdraw defenses to a claim of patent infringement and to agree to delay or forego altogether entry into the market is anti-competitive, and it also is not immunized by anything in patent law. Unaided by anything in the antitrust law, it is contrary to patent law for a brand-name patent holder to pay a generic manufacturer not to assert defenses to a claim of patent infringement. In a whole series of cases decided by the Supreme Court and exemplified by the decision in Blondertongue Labs versus University of Tennessee Foundation, the Supreme Court has made crystal clear a couple of things. One is that because of the far-reaching social and economic consequences of a patent, patents are by their very nature affected with the public interest. And the Supreme Court in Blondertongue's laid down that principle and then said that two policies of patent law, not antitrust law, but patent law, flow out of that principle. The first policy is that courts should be on guard to make sure that patentees do not extend exclusion beyond the subject matter or the temporal scope of the patent. And that's the part that the district court has seized onto and a couple of other courts have seized on to fashion a standard for these sorts of cases. Unfortunately, the district court and a couple of other courts have altogether ignored the other set of cases that the Supreme Court has made crystal clear are implicated by this principle that patents are affected with the public interest. And that second set of cases, says the Supreme Court in Blondertongue's, is that there is a federal policy in favor of encouraging the judicial testing of patent validity and scope. And the Supreme Court in the Lear case has made clear why that is so. Our patent system consists of a patent examiner. We're talking about drug patents now, not other kinds of patents. Basically what's at issue are patents on drugs. Yes, Your Honor. What I've said so far applies to all patents. Of course, that policy in favor of the judicial testing of patent validity and scope is further heightened in the context of pharmaceutical patents by the Hatch-Waxman Act. Yes, that's right. That's right in the statute. Yes, the Hatch-Waxman Act specifically encourages judicial testing of validity and scope because of the specific drug patents in particular, no question about it. And our point, and we think it's quite a simple one, is that it is absolutely contrary to this policy applying to all patents, but specifically heightened in the context of pharmaceutical patents. If the policy is to encourage judicial testing of those patents, what possibly could be more antithetical to that policy than to allow the patentee to pay cash money to the alleged infringer to say, you got me, your patent is valid and infringed and I'll agree to stay out of the market? Because that's what's going on here. For money. For money. No question about it. In this case, $60 million. In some of the other cases, the Cipro case, $380 million. We're talking about tens, hundreds of millions of dollars. It almost sounds like you're arguing for a per se rule, but you're not arguing that, are you? Not at all, Your Honor. And let me make clear, too, that any kind of a settlement involves the withdrawal of patent defenses by the generic manufacturer, but neither we nor the government contends that it's impermissible for the generic and the brand to agree to a license that's based on their own respective views of the strength of the patent. But when you limit the coin of settlement to simply a splitting of the patent term, the generic stays on the side of consumers. What I've said is the generic's incentives at that point are to get a short exclusion, as long a license as the patent merits will allow in its own unilateral judgment. The difficulty with these cash payments is, let's say that the generic manufacturer would otherwise say, I've looked, studied this patent to the nth degree. There's 10 years left. Based on my judgment, I'm discounting the probability of winning this case. I think that I would accept a license that's a five-year license. That would be fine with us. But now comes the brand name manufacturer and say, well, okay, you would accept a five-year license, and that would be very helpful to consumers. But how about a two-year license and $60 million? And that's the problem with these cash payments. It moves back the period of the license that the generic manufacturer would otherwise demand based on its view of the validity and potential scope of the patent. And this problem of these payments can, I think, best be put into perspective by looking at the standard that the district court here applied and that comes out of the tamoxifen two-to-one decision in the Second Circuit. And that is, they say these payments are okay as long as the underlying patent litigation was not itself a sham. Think about that. The sham standard protects the following interest of consumers. The sham standard applies from the unilateral decision by the patentee to prosecute the patent at all. In a sham case under the PRE standard, the mere prosecution, the fact that a lawsuit exists can harm consumers because it imposes costs on the alleged infringer and can take some time. The sham standard is appropriate to protect consumers in that circumstance because the lawsuit is going on. Under the sham standard, there's still an adversary on the other side with incentive to come forward and say the patent is invalid, and that's not the right scope. There's a neutral decision maker still in place, the federal court, whether judge or jury. And any exclusion that ultimately results from that litigation results from a government decision that this is the validity of the patent, this is the scope of the patent, and we, the government, say that's your rights. Thank you. Your red light is on. When I said the red light was on, it wasn't for you. Okay. May I have one minute just to draw the contrast with the sham standard here? Yes, go ahead. In that circumstance, which, by the way, is balanced against the patentee's First Amendment right to petition the government, then the district court here uses that same standard for a payment where the payment eliminates the adversary, eliminates the neutral decision maker, the federal court, withdraws a petition from the government, and excludes competition based not on a government decision but on a private treaty reached between competitors. And just to state that that standard, that sham standard, was transplanted from an entirely different context to protect an entirely different set of consumer interests to this circumstance is to show that something went terribly wrong here. Thank you. Do you disagree with the Tamoxifen decision in the Second Circuit? Absolutely. And do you, or do you, is it your position that the settlement did not expand the scope of the patent in this case? The settlement did expand the scope of the settlement in this case. The Tamoxifen decision we disagree with on its facts where it was a compound patent and the only question was validity. But the Tamoxifen decision itself distinguished this case. It said that's unlike the Kader cases pending in the District of New Jersey. And then in Judge Pooler's subsequent decision in the Second Circuit, specifically limited Tamoxifen to where cases in which the only question is one of validity. But she wasn't the majority. Oh, yes. I'm sorry, Your Honor. In that decision she was. So there was a subsequent decision in the Second Circuit. Judge Parker, Judge Newman, Judge Pooler unanimously said we disagree with Tamoxifen, but it's limited to the following circumstances, including… Well, they asked the circuit to embank it and they didn't. That's correct, Your Honor. I think you can read that decision and say… Well, we read it. Those are three judges who were unhappy with Tamoxifen. Thank you. Thank you. Thank you. May it please the Court, my name is Malcolm Stewart. I represent the United States and the Federal Trade Commission. I'd like to start out by explaining why there are economic incentives for participants in the Hatch-Waxman litigation to enter into settlements that include reverse payments, because by understanding why that would be in the party's interest, we can understand why it raises antitrust problems. When the parties to Hatch-Waxman litigation agree upon a point of deferred generic entry, they're not simply agreeing upon how a fixed pool of money is going to be divided. They're agreeing on how big the pool will be, because it's well established that the longer the brand name manufacturer has the patent monopoly, during that period, the brand name's profits will be greater than the combined profits of the brand name and the generic manufacturer would be during a period when the two compete. And so the longer the point of generic entry can be postponed, the greater will be the combined profits of the entity. Now, if all of that added increment of profit were to be captured by the brand name, the fact that the combined profits of the two entities were increasing would be no incentive for the generic to agree to that deal. And so, in a sense, the reverse payment is a mechanism for getting the generic to care more about the combined profits of the two entities than about its own profits as an independent drug manufacturer. And for that reason, the settlement raises public policy, public interest concerns that would not be implicated if the parties were simply dividing among themselves a fixed pool of money. Mr. Stewart, let me start with a long question, and I'm not going to use economic terms. I'll use regular lines. My degree was in economics, but it's long ago and economics has changed now. The Hatch-Waxman statute reflects the congressional understanding that antitrust values are enhanced when generic drugs challenge patented drugs. And part of that reason, I gather, and there's nothing on the record that suggests otherwise, that the FCC did a study and something like 73% of the patented drugs were found unpatentable or excessive in terms of what they asked. Is that the basic? Well, the FTC's study was based on cases that were litigated to judgment. And so they determined that in that set of cases, the generics won approximately 73%. I don't think that corresponds to a finding that 73% of the drug patents are invalid because the class of patents in which generics are willing to go to litigation and to fight to judgment are presumably those in which the generic feels a greater degree of confidence of prevailing. But there was at least a substantial problem with patents that were found either to be invalid or not infringed by the generic activity. And therefore, it's in the public interest and in the interest of the competition, reflected by the Sherman Act, for the generic to challenge the patent, patented drugs, pharmaceuticals. That's correct. Okay. So to avoid the challenge, you say the patent holders try to buy off the competitive challenger by reverse payments, which include a settlement agreement that the generic will not enter the market until the patent expires or close to the time the patent expires. Okay with me? Up to now. All right. And presumably, everybody in the market recognizes that that would be a per se allocation of market, which violates the antitrust law. So the agreement between the generic and the generic holder of the $60 million, the now $60 million, adds some plus factors. Let me call them, you know, they give licenses, et cetera. And you assume that the plus factors don't come to $60 million. How are we to know that? How are we to know what the value is of what's given on one side? How does that equal the $60 million? I mean, is that just a presumption? I mean, I think I would start by pointing out that the question of the adequacy of whether the $60 million was, in fact, consideration for the upshare licenses rather than for delay in generic entry. That question is not directly before the court. That is, that was one ground on which the defendants moved for summary judgment. They said the $60 million was not payment for delay. It was payment for the licenses. The district court found that that question wasn't susceptible to resolution on summary judgment because there was a disputed issue of fact. Yeah, what evidence is there on the record of what they bought or what they paid the $60 million for other than keep out? The position of the defendants was that Scheringflau paid the $60 million as a licensing fee for patents that Upshure owned on other pharmaceutical profits. And they introduced evidence from their higher-up decision makers to the effect that this was basically an unrelated deal, that it was sold to the board of directors as something that they would want to do irrespective of the settlement of the infringement litigation. There was competing testimony to the effect that people who had the expertise in the relevant drug product, the Upshure product, were not consulted as to whether this was a good deal or not and that this was a subterfuge. And as I say, that was not resolved by the district court. I think because we're here on an appeal from a district court judgment granting summary judgment to the defendants, we need to resolve inferences as to disputed facts in favor of the non-moving party, namely the plaintiffs. So this question is certainly one that would have to be resolved on remand if the court agreed with our position on the basic legal issue. But it's not one that is directly before the court now. But I think to return to – How do we avoid relitigating – and I'm getting confused by terminology here. I have to confess to that because I keep hearing the word validity. But I didn't think validity was an issue in this case with respect to the Shering Plow patent. It was just a question of whether the generics infringed. That's correct. And I think there's a distinction. I agree. And the plaintiffs have made that argument. The district court, the special master, believed that the two should be resolved under the same standard. I think under our view, they would be resolved under the same standard, although a different one from – How do we then avoid relitigating the question of whether the generic infringes the branded company's patent? Our position would be that the brand name and the generic can settle these suits simply by agreeing upon a compromised point of generic entry. And if that's the only term of the settlement, if there is no payment made by the brand name to the generic, then we'll simply assume that the compromised point of entry reflects the party's assessments of the strength of the suit, both the claim of patent validity, if that's contested, and the claim of infringement, and we'll leave it at that. We won't have the courts looking behind that agreement to see whether, in fact, the parties misperceived the strength of the infringement claim. When a reverse payment is made, the calculus differs, because at that point, there's no reason to assume that the point of generic entry in and of itself represents a reasonable compromise of litigation. I mean, to take an analogy, if you heard that two parties had settled a dispute and the terms of the settlement were the defendant pays the plaintiff $5 million in cash and conveys 1,000 acres of land, and then you asked, what would the parties have viewed as the reasonable settlement value of that case if land had been the only consideration? You couldn't say with much precision, but you could say with a high degree of confidence it would be more than 1,000 acres, because if the parties thought 5 million plus 1,000 acres was fair, if it were only land, it would presumably be more than that. So when the terms of the deal are the generic agrees to defer entry until a particular point in time, and the brand name agrees to pay the generic X number of millions of dollars, then we can confidently infer, had there been no payment, the point in time chosen would have been earlier if there had been a settlement. Now, the defendants correctly point out that in some reverse payment cases, even though both parties would agree that some earlier point in time represented the fair compromise value of the settlement, they might not be able to agree on exactly what point in time that should be, and therefore they might litigate the case to judgment. But in our view, that's not an obstacle to the application of our theory. I thought that was the question I had asked you at the beginning, and you said, we can't get into that now. No. A similar question. Well, I think they were somewhat distinct in that even if there had been no upshare licenses, that is, even if the only terms of the settlement had been the generic delays until a date in 2001 and $60 million change hands, the defendants would still be arguing that the settlement was valid, it was not a violation of the antitrust laws because the point of generic entry to which they had agreed was not later than the expiration of the patent, and that would be their test. And there's been much made in the briefs about the fact that here the agreed-upon point of generic entry was significantly before the expiration of the patent. But on defendants' own legal theory and on the legal theory that the district court adopted, that fact is irrelevant to the disposition of the case. That is, defendants' legal test is so long as the suit was not objectively baseless and so long as the PTO was not defrauded in connection with the issuance of the patent and so long as the agreed-upon point of generic entry is not later than the expiration date of the patent, the settlement is valid. And so on defendants' theory, this would be exactly the same case if there had been no upshare licenses, if $60 million had been paid and upshare had agreed to defer entry until the date on which the patent expired. Of course, your presence here shows that there can be two bites at the apple. I have trouble with the fact that we had the 11th Circuit that said this agreement did not violate the antitrust laws. Well, I'd say a couple of things about that. The first is I think that the primary basis on which the 11th Circuit decided the case was on the ground that it overturned the FTC's factual conclusions and determined that the $60 million was consideration for the upshare licenses rather than for delay in generic entry. And as I said before, that issue is part of this lawsuit, but it's not currently before the court because the district court held that it wasn't susceptible to resolution on summary judgment. And then I guess the second point is to the extent that the 11th Circuit offered additional thoughts on the proper antitrust analysis that would apply had there been no licenses to explain the consideration, either you think the 11th Circuit's reasoning is persuasive or you don't. Certainly, you owe respectful consideration to the views of another court of appeals. But if at the end of the day you're unpersuasive— It's not binding. It's not binding. And the happenstance that the 11th Circuit offered those views in analyzing the same settlement that is at issue here doesn't make them any more binding than they would otherwise be. Because although we're appearing here as amicus, it is the plaintiff's case. Nobody is arguing that they are precluded from relitigating the questions that were decided by the 11th Circuit. You would put the presumption on the government's side, the presumption that this is an antitrust violation, and ask the defendant to rebut that presumption, right? Would you look at it as an allocation of markets? I think we would not say that if the only term of the settlement were the party's compromise on a date of entry. That is, even though that standing alone, a generic competitor's agreement not to compete before a particular date— You wouldn't say that was an antitrust violation? We would say that was an antitrust violation outside the context of settlement of litigation. But we do agree with the defendants that the existence of the patent, the existence of patent litigation, changes the calculus. And so the parties have latitude to agree to settlements that would be antitrust violations if they occurred outside the rubric of litigation. And in particular, if the only term of the settlement is a compromise date of generic entry, we feel that the public is adequately protected. Because as Mr. Shadowin was explaining, usually in these negotiations, the brand name's interest is in getting the latest date of generic entry that it feels is achievable in light of the strength of the case. The generic's interest is in getting the earliest date that it believes is achievable. And so if they reach a compromise, then we believe that, in a sense, the generic has acted as a surrogate for the public. That acting to protect its own economic self-interest, it has adequately vindicated the public interest in getting generics on the market as soon as is practicable. Doesn't it depend on how far from the patent expiration that would be? Certainly, the case is most clear-cut in one where the agreed-upon date of generic entry is at the very end of the patent term. Because then you can say there's no real possibility that the settlement made consumers better off than they would have been otherwise. You don't have to worry about the deadline. We have a lot of questions.  This came from Washington. Thank you, Your Honor. I hope they let you use the fast train. The judges can't go away now. They did, Your Honor. I appreciate it. So I think even in cases where the settlement, as in this one, where the settlement provides for generic entry significantly before the patent term was scheduled to expire. I first remind the court that's irrelevant under the defendant's theory. But even apart from that, the natural inference is that when the parties have selected a particular date and have also provided for a substantial reverse payment from the brand name to the generic, the natural inference is that if both parties had been asked to identify the compromise date that would have been a fair settlement absent the reverse payment, they would both have picked earlier dates. That is, there's no reason that the generic, who's content with $60 million plus an entry date of I think it's September 1st, 2001, there's no reason to think the generic would be content with an entry date of September 1st, 2001 without the reverse payment. And so we would acknowledge that if our theory were adopted nationwide, you would have some cases in which, because the reverse payment mechanism was essentially unavailable, the parties would choose to litigate those cases to judgment. And in some of those, the patent holder would win. And in that set of cases taken in isolation, it would be accurate to say that there was less generic competition than there would have been if a settlement with a reverse payment providing for early entry had been permitted. But the Supreme Court in California Dental has indicated that in doing rule of reason analysis, it's appropriate to take into account net anti-competitive effects and relative anti-competitive tendencies. And in over the run of cases, adoption of our position could be expected to produce gains for consumers. First of all, in some cases at least, even if the reverse payment mechanism is not available, the parties will simply settle for entry at an earlier date, and that will be an unalloyed gain for the consumers. And even with respect to the class of cases in which the parties choose to litigate to judgment, we would expect the outcomes of that class of cases in the aggregate basically to correspond with the parties' own assessment of expected litigation outcomes. And so if the parties through reverse payments have systematically delayed entry beyond the point that they believe would correspond to a fair compromise value of the litigation, we think the outcomes in the lawsuits would mirror their expected outcomes of litigation rather than their expected outcomes deferred by X number of months. So now why do you say there's a presumption of antitrust violation if the patent holder pays this reverse payment to the generic? Why is there that presumption? Because the normal inference is that if the generic is getting that money, it is giving up something else. And the natural inference would be that what it's giving up is the earliest entry date that it could otherwise have achieved. Now, the presumption is capable of being rebutted if the defendant showed that the payment was not for delay in entry but instead for some other consideration. But as I've explained before, if the upsurge in this case agreed to entry on September 1, 2001, plus $60 million, just to pick a data, the FTC estimates that on average, settlements with reverse payments in the Hatch-Waxman context provide for generic entry 17 months later than settlements without. And so if we just use that as a very rough estimate, that without the $60 million, the generic would have been allowed to come in 17 months before September 1, 2001, somewhere around February of 2000 or so. Then in that context, there is significant loss to the public, whereas if there had been reverse payment, we would say the September 1, 2001 date simply reflected their good faith assessments of the settlement value of the litigation. If all cases like that had been tried to judgment, we would assume that the aggregate impact would be roughly the same. I mean, to take another analogy, if you had a case in which a lawyer was representing the defendant and was sued for $10 million and estimated the chance of prevailing as 40 percent, a 60 percent chance of losing, and was offered a settlement for $9 million, most practicing attorneys wouldn't regard that as a good deal. And economists would have various ways of explaining why it's not a good deal, but perhaps the simplest way is to say if you repeated that 10 times, if you settled each of them for $9 million, the client would pay $90 million. If you litigated each of those cases to judgment, if the attorney's assessment was accurate, the client would lose six and pay $10 million in each and would pay $60 million rather than $90 million. Now, it's certainly true that in an individual case, when the case goes to judgment and the client loses, everyone can say you would have been better off in that case taking the $9 million, but that's not the way that most attorney settlement calculations would work. And it's particularly extreme when we look at the standard that the district court applied here and that the defendants advocated. As I said before, the defendants say it's good enough if the suit was not objectively baseless, the PTO was not defrauded, and the entry date is no later than the date of patent expiration. And what that would be analogous to in a sense is a lawyer representing a client who sued for $10 million and thinks that there's a 40 percent chance of prevailing and comes in and says the plaintiff has offered to settle for $10 million. I think you should take it. It's a good deal. The suit is not objectively baseless, and the outcome that they're offering us is no worse than the outcome we would have suffered if we had litigated the cost of the case and lost. No one would think of that as responsible representation or responsible settlement advice. And obviously the generic in this context, its lawyers are not representing the public directly, but they are entering into agreements that would ordinarily be per se violations of the antitrust laws. That is the agreement of the potential competitor not to compete. And so we ought to have some assurance that the public interest is being adequately protected in the deals that they reach. And they say what makes this case different is that it's a settlement of litigation. Well, we think to the extent that the court is called upon to balance settlement policy against antitrust policy and announce a rule that gives adequate range for reasonable settlements, we ought to be talking about reasonable settlements that accord with the principles that practicing lawyers would apply in deciding whether to accept or reject or to recommend acceptance or rejection of a settlement offer. Let me see if I understand this then. The stronger the patent holder's case then, the less likely it is that the payment would be a problem from antitrust perspectives because you're not really effecting a delay of entry. I don't think I would say that because I think even if the patent holder perceived its patent to be very strong and thought, for instance, and say there were 10 years remaining in the patent and the patent holder felt confident in the strength of his case and felt that without a reverse payment, eight years down the road would be a reasonable point of generic entry. That would be a reasonable compromise given our assessment of the strength of the case. If the patent holder then agreed that the generic could come in after nine years or after 10 years and paid the generic money, there would still be an increment of one or two years in which the generic was not competing that accepting the patent holder's own assessment of the strength of his case would still go beyond what was a reasonable reflection of the party's litigation prospects. Whenever we see a substantial reverse payment, the natural inference is it bought some additional increment of delay beyond what the parties would otherwise have considered reasonable. Irrespective of whether there's any other consideration, for example, licensing some patents. Exactly. If there is another explanation for the payment, then we can take that on its own terms. But in the simplest case where no other explanation is offered, where the only terms of the deal are the generic can come in after nine years and will receive X number of million dollars, we would still assume that that payment was in exchange for some increment of delay. Now, it is the case we would certainly agree that if the parties were simply reaching the kind of settlement that we think is appropriate, namely they agree to a compromise point of generic entry and that's the only term of the deal, then the stronger that the parties perceive the infringement suit to be, the later the compromise date that you would expect them to arrive at. And so in that sense, the parties' own assessments of the strength of the case are going to affect the settlement they reach, and we have no objection to a settlement like that. Any reverse payment is unreasonable. Any reverse payment is presumptively unreasonable in the sense that it is— You've talked about reasonable and unreasonable reverse payments. Well, I think when we say reasonable and unreasonable reverse payments, we have two particular things in mind. The first is we've indicated that a payment that is roughly commensurate with not greatly in excess of anticipated litigation costs is not going to be a problem under our theory, because then we would say the reason that the brand name is willing to pay that money is not as consideration for delay. It's just it wants to settle the case, and it's paying out money that it would pay in legal fees in any event. And then the second primary way in which the presumption could be rebutted is through something like the Upshur licenses here, that is, if the overall agreement included another form of consideration flowing from the generic to the brand name. That's why I asked you at the beginning how much you value all those licenses. But leave that aside. You recognize—we don't usually accept presumptions unless there's a way to rebut them. And you recognize that in your brief. In your brief, you say, in other words, the defendants can overcome the presumption by showing that avoiding the Patent Act procedures for excluding alleged infringers did not depart from the balance struck in the Patent Act. What does that mean? I think it was a way of trying to get at the point that I was getting at earlier, which is— Yes, please speak in English. Okay. I think what we are saying is so long as the compromise point of generic entry simply reflects the parties' shared assessments of the strength of the litigation— That's right. Okay, go ahead. And so if, for instance, there were 10 years remaining in the patent term at the time the settlement was consummated, if the parties thought that the infringement suit—these are rough figures—but if the parties thought the infringement suit was relatively weak, they might agree that the generic could come in three years down the road if it was stronger five years and seven years and so forth. If the patent was strong or the generic was strong? The claim of patent infringement, which would include both the strength of the patent and the strength of the infringement claim to the extent that infringement was a contested issue. And again, we agree with the defendants at a very general level that the court's task is to attempt to harmonize antitrust law, patent law, settlement policy, and we would add hatch-waxman policies. And so we would agree that the parties have significant latitude to reach settlements of patent suits that, as standalone agreements, would be per se antitrust violations. It's just— That would be a market division. Exactly. And so it's only— And you don't claim any per se violations. No, no. That's correct. Neither does the private parties. That's correct. I think they are acknowledging that there can be circumstances in which there is some other explanation for the payment that rebuts the inference that it is for delay past the hypothetical point that would represent the fair settlement value of the case. But you assume that the generic is standing for the public, because the FTC's brief—I forget what it is—says several hundred million dollars of public money is going into the patent holders' hands when it shouldn't be, really. I mean, certainly there are a lot of governmental purchasers of pharmaceuticals, including through Medicare and Medicaid, also purchases of drugs for VA hospitals and so forth. So the losses to consumers total are much larger than that, but there is a significant more direct governmental interest in the case to the extent that we are— You're purchasers. We're purchasers. You're direct purchasers. We're purchasers. Just like the direct purchasers, Rite Aid and whoever else were his clients. That's correct. And when we were talking about the generics kind of standing in for the public, we were not suggesting that the generics perceive themselves to be fiduciaries for the public. Obviously, they are profit-making corporations, and they're thinking in terms of their own bottom lines. Our point is that to the extent they are simply negotiating for a compromise point of generic entry, their interests are aligned with the public. They tend to benefit as the public benefits. And therefore, if they say five years down the road is the best we can get for us, we tend to think that's the best that we can get for the public because they have the same stake in the litigation. And I think in any context, if you had one person who was negotiating on behalf of himself and several others, if he reached an agreement that provided that he would be treated the same as all the other people he represented, that there would be a natural instinct to feel a certain amount of confidence that he studied it more than the other people have, and if he thinks that this adequately protects his own interests, then it probably protects the interests of the people he represented as well. But if we had a deal in which the person who was doing the negotiating received some substantial benefit that wasn't given to the people he represented, the basis for that confidence would be demolished. And essentially, that's what we have with the reverse payment. When the generic company gets a reverse payment, there's no longer any basis for thinking that because the generic perceives the overall deal to be in its interests, it's probably in the interests of the public as well because the generic is getting this large monetary payment that's not being shared with the public. And at least the natural inference is it's giving up something that the public cares deeply about, namely the prospect that generic drugs can compete as early as possible. Hatch-Waxman is in the statute anti-competitive. Has the government ever taken that position? I mean, because if you accept the statute as it is, you're holding off competition from other generics for a period of time. I mean, I think there's force to that, and the Supreme Court has made essentially the same point with respect to the Patent Act. That is, it has said some things that would otherwise be the type of behavior that would be forbidden by the antitrust laws are not forbidden because they are either expressly or implicitly authorized by the Patent Act. And so a patent is, the Supreme Court has described it, a species of monopoly. To that extent, it might be seen as inconsistent with, in principle, with the antitrust laws. Certainly when a patent holder files an infringement suit, what it is literally seeking to accomplish is a restraint of trade. That is, it's seeking a judicial order that would either prevent competitors from competing or make them pay damages for competition in which they've already engaged. But the Supreme Court has said that the Patent Act and the Sherman Act have to be construed in peri materia because neither is supposed to override the other. And we would say the same thing about the Hatch-Waxman Act. That is, to the extent that the Hatch-Waxman Act expressly authorizes conduct that would otherwise violate the Sherman Act, then the Hatch-Waxman Act would control. Here we deal with a question, namely the range of permissible settlement terms that is not specifically addressed in either the Sherman Act or the Hatch-Waxman Act, or the Patent Act for that matter. And so it's necessary not to look to express statutory language but to reconcile the competing policies as best we can. Senator Hatch himself has said that he thinks these reverse payments are anti-competitive. That's correct. I don't know the Waxman. Is Waxman a representative? Is he still there? I believe he's still there. He has also expressed opposition to the – Oh, yes. Congress has not to this point passed legislation that has specifically addressed the propriety of reverse payments. The only amendment was an amendment that put it on the record. The legislation that has been enacted – there have been various legislative proposals that would go farther than that. But the measure that was enacted in 2003 said, among other things, all of these settlements, whether they include reverse payments or not, should be provided to the antitrust enforcement agencies, the Department of Justice, and the Federal Trade Commission. And so when I said earlier that the Federal Trade Commission estimates that the – or has determined that the average period of delay is 17 months greater in cases for settlements that include reverse payments than for those that don't. It based that conclusion on its study of settlements that were provided to it in accordance with that 2003 statutory mandate. Let's make that explicit. So the 17 months that you're talking – that they were talking about were 17 months of no competition from the generic. That's correct. And, again, this is an average. That doesn't prove that in any particular case the parties would have entered into a settlement providing for 17 additional months. That's the average that the FTC has arrived at by studying settlements of Hatch-Waxman cases that did and did not include payments from the brand name to the generic. The other figure that is noteworthy – or another figure that is noteworthy in that study is that the FTC determined that – I believe it's from 2004 to 2009 – approximately 70 percent of these settlements didn't include reverse payments. So the experience of – What percent was that? Seventy percent of these settlements did not include reverse payments. So while the FTC and the Department of Justice regard this as a problem, it's the experience of the participants in the industry have not been that these terms are essential in order for settlements to be consummated at all. Are there any studies that would – I suppose there aren't, but studies that would indicate whether adopting the position of the FTC that any payment would have to be scrutinized, because it would be a presumption that it violates the antitrust law, would disincentivize or provide a negative incentive for generics to come forward to test the scope of the patent held by the branded? If they can't get – if it's a win-or-lose proposition for them, it's too big of a gamble to get involved at all. Well, rather than – at least if they get involved now and get a payment, consumers may benefit because the generic still enters the market sooner than it otherwise would have. I don't know of any studies that have addressed that question. That is, I have seen it suggested in at least one judicial opinion that adopting the rule that we advocate would have that effect, but I don't know of any studies that have – Which opinion? It was Judge Posner's opinion in Asahi when he was sitting as a district judge. The other thing I would say about the tamoxifen standard, the standard that was adopted by the district court and endorsed by the defendants in this case, is that it by and large equates the standard for scrutinizing a settlement of this sort with the standard that would govern if the mere filing and prosecution of a lawsuit were alleged to be an antitrust violation. And as Mr. Shadowin was indicating, there are various reasons to believe that that comparison is an inapt one. There are constitutional overtones – Is apt or inapt? Is an inapt, not apt one. Okay, yeah. There are constitutional overtones, constitutional problems with limitations on simply requesting relief from a governmental body. If a patent holder simply prosecutes the patent suit to its conclusion, it is leaving in the hands of a governmental decision-maker the ultimate conclusion as to whether relief will be granted. Don't we do that all the time? They do that all the time.  That's correct. And so for various reasons, our system is loathe to limit very greatly the mere requesting of relief from a governmental body. But here what we are scrutinizing is not the request for relief. It's a private agreement between the two parties. And concerted behavior between competitors has always been the particular focus of Section 1 of the Sherman Act. The other thing I would say is that the Toxophen standard effectively determines the fairness of the settlement based on the assumption that the patent holder would have prevailed if the suit had been litigated to judgment. That is, it says, so long as the public is no worse off than it would have been if the patent holder had prevailed. That's the scope of the patent.  The point of a litigation settlement is that the outcome is uncertain. Not only is the outcome uncertain, but the parties to the agreement are on the public record as having divergent views as to what the right outcome is. That is, the brand name in these suits is contending that the patent is valid and infringed, and the generic is contending either that the patent is invalid or that it's not infringed or both. So when you have an agreement that's alleged to be suspect regarding an unsettled legal matter as to which the very parties to the agreement have stated divergent views, it seems particularly unreasonable to assess the propriety of the agreement by simply assuming that one side would have won. So I guess the last thing I would say is I'd like to reiterate that we are not anti-settlement, and we're not anti-settlement in the Hatch-Waxman contest. But you're pro-antitrust. Beg your pardon? But you're pro-antitrust. We're pro-antitrust, and we believe that the admittedly strong public policy in favor of consensual resolution of litigation has to be balanced against antitrust values and Hatch-Waxman values. And in our view, the appropriate way of drawing that balance is to say that so long as the parties are simply agreeing on a compromised date of entry based on their mutual assessment of the strength of the patent suit, that's fine. The parties shouldn't have to worry that a court in an antitrust suit will then look behind their assessment to decide whether it's right or wrong. But when the parties depart from that assessment by means of a payment by the brand name intended to induce further delay in generic entry, at that point, we believe that antitrust values override the strong public policy in favor of voluntary settlement. I think Judge Stengel asked you whether you then challenge every reverse paint. And I'm not clear what your answer to that was. I think we would say some reverse payments are reasonable. I think we would say that once there is a reverse payment, that is, a payment from the brand name to the generic. They keep out. Well, when there is a payment from the brand name to the generic period, within the context of an agreement that also commits the generic to refrain from competition for a specified period of time, when you have an agreement that includes both of those terms, our starting point is to presume that the one was consideration for the other. But that presumption can be rebutted. And so the defendants are free to offer another explanation for the payment to explain why it was for something other than further delay in generic entry. And the two principal ones that we have in mind are a payment roughly commensurate with anticipated litigation costs and a payment that is made for some identified alternative consideration in the agreement itself. Here, defendants have made the latter of the two arguments by saying that it was a payment for the upshare licenses. Yes, and how is the court supposed to evaluate whether the other option really equals the amount of the payment? In some cases, it may be difficult. That is, in some cases, it may be easy if the thing being bought is something like treasury bonds. But leaving that hypothetical aside, I think you are correct that that standard is not always going to be easy of application. There may need to be fact-finding proceedings in order to determine what the parties had in mind, what their motivation was for entering into the agreement. But, of course, the parties can all – I can't judge an agreement, the value of an agreement, by what the parties had in mind. Well, I think in some instances, for instance, with a patent license, the value of a license to practice a particular patent is likely to vary widely from one person to another. That is, a company that actually wants to and has the resources to produce the goods or engage in the activity that is covered by the patent may value very highly the right to practice the patent free of an infringement suit. Another company that has no interest in producing the particular product may attach no value to it. But I guess the other thing I would say is this is the type of question that courts would have to grapple with in some other sorts of antitrust suits. That is, it's not a problem that's unique to the Hatch-Waxman Conduct and Summary Judgment. Well, they would either – they would have to decide at Summary Judgment whether there were disputed issues of fact. But I guess my point was going to be if you had a situation where, at roughly the same time, Company A paid $60 million for patent licenses from Company B, and then at about the same time, Company B announced that it would not enter into competition with Company A in a particular market. If those are two truly independent business decisions, there would be no antitrust problem. You wouldn't claim that they were independent. I mean, the Justice Department just wouldn't. I think particularly if there were no evidence of kind of prior extended negotiations between the parties for the licenses, if the licenses seemed to spring out of the blue, we would look suspiciously at that. But it would always be open to the company to say, no, this was truly a separate arms-length deal. The agreement of Company – the statement of Company B that it would not compete was an unrelated independent business decision. You wouldn't believe it. I mean, I know. I've dealt with the Justice Department. You wouldn't believe it. But whether we are or not overly suspicious or appropriately suspicious, the point is that Section 1 applies only to agreements. There is lots of conduct that is perfectly lawful if it is engaged in by two competitors as a result of independent business decisions, like pricing goods at the same price at the same market. That is unlawful under the antitrust laws if it's undertaken pursuant to an agreement between the two parties. And so kind of the existence of hard questions about whether the parties perceived those two events to be linked is simply part of the cost of doing antitrust business, at least in the Section 1 context. And what we're urging here is high knowledge. But you've closed your antitrust office in Philadelphia, they tell me. I'm sorry? You've closed your antitrust office in Philadelphia, Justice Department. They tell me that. I don't know. So you have to take the train. Yes. But what should happen in this case? In our view, the grant of summary judgment should be reversed or vacated. I'm not sure exactly what terminology you would use. The trial court should do what? The trial court should then determine whether the $60 million was in fact intended by the parties as consideration for the upshare license. That's the fact-finding that you talked about. That's correct. Is this issue pending in any other circuit right now? I know there is an 11th Circuit case in which argument has been held in which at least the general question as to the appropriate standards for assessing the legality of reverse payments is pending. Not this case, not the upshare case. Oh, no. No, I'm sorry. Yeah. No, this case, as far as I know, there are no other pending challenges to this particular settlement. But then there are, as far as you know, challenges in other circuits? I know there is one case pending in the 11th Circuit. I believe it's FTC versus Watson. And to some extent, the options before the 11th Circuit are more constrained than is true of this court because the 11th Circuit does have law. That's part of the evidence. Yes. Yes. So the 11th Circuit is kind of hearing arguments both as to what the right answer is and to what extent is it constrained by circuit precedent from adopting particular views. This circuit obviously is not in the same position. Okay. Thank you very much. Thank you. Thank you. We'll hear from Mr. Neal. May it please the Court, and I think it's good afternoon. I guess so by now. My name is John Neals, and I represent Appellee Merck, which used to be Shearing, which explains the name Shearing all over the papers of this case. I would like to do, if I may, four things. First, I would like to respond, Judge Slobodur, to your question about the side deal, the licenses, what that was all about. Second, I'd like to respond to, I think, questions from both your Honor, maybe all three of you, about whether a presumption of illegality is warranted in the case of a true or reverse payment. And third, I'd like to respond to Judge Vinasky's question about how do you do a rule of reason, which is what they're arguing for, without getting back and relitigating the patent case. And fourth, I would like to talk about settlement considerations and settlement policy. And I would like to start by saying these are difficult questions. I think everyone in this courtroom knows that, and they're important. Other courts have thought about these a lot. Courts have actually changed their view of them in mid-case, some district judges. And what has happened in other circuits is that the law has coalesced around the standard, the scope of the patent standard that was applied by the judge below. But first, let me answer the questions that came. Your Honor, first of all, the issue of whether the $60 million was paid bona fide, in good faith, fair value for the licenses that Shearing received was the main issue, not the only issue by any means, but the main issue that was tried for nine weeks. I was there. Some of the other people in this courtroom were there before the FTC. It was tried extensively. And at the end of the day, so to speak, the 11th Circuit held that there was simply no evidence in the record that this was anything other than what it purported to be, a good faith, fair value payment. And because Your Honor has expressed interest, I'm going to briefly review the facts so you have an understanding of what that trial was all about. First of all, the negotiations went like this. The generic came to us first and wanted to settle. They asked for money. We said no. I think they asked for money a second time, and we said no. And then we steered the conversation around to a settlement that would simply split the remaining patent life and settled on an entry date of September 1, 2001, which is the date that was eventually put into the agreement, which was. . . The patent would expire. Would have expired when? It expired five years after that. Oh, six. Almost exactly, yes. And so it was. . . And we were about four and a half years away, or four and a quarter. . . What is this drug for? It's for potassium. It's a potassium supplement, Your Honor, which people who take certain kinds of heart medication need, and not relevant really to any issue. But it's not an expensive drug. For a brand-name drug, it's not very expensive. But the patent is really for the thing on top of it. For the sustained release mechanism that goes into it, exactly, Your Honor. In any event, when we got to the talking about this entry date of September 1, 2001, the testimony is the Upshur CEO, who was conducting these negotiations, said, Well, that's all very fine for you, but I don't have cash in my business that is going to get me from today until September 1, 2001. And Shearing said, If you had something to sell us, we'll pay you that we would have bought anyway. We'll consider buying it. So they put on the table a sustained release niacin product. It is documented that Shearing had just finished trying to obtain the rights to a sustained release niacin product. They had failed. Those negotiations had fallen apart. And Shearing had a very important strategic reason they wanted a sustained release niacin product. It's a cholesterol-reducing remedy. And Shearing's biggest pipeline product, by far, and the biggest product that it brought to Merck was a heart remedy. And Shearing had never marketed any heart product in its history. So it desperately wanted to get a product it could market to heart docs so that they got to know the industry before this Vitorin Zetia product, which is now a huge product for Merck and Shearing. So they could have done that without any agreement when the generic would come into the market. I mean, why combine the sale or the licensing of that product and whatever it would show you get it on the market with an agreement holding the generic off the market? The way the negotiations went, they had reached a compromise settlement date without regard to the license. And the generic said, we got no cash. We're cash-strapped. That's one of the things you'll see in the SG's brief that they think is perfectly fine. And so in order to get the settlement done, one, and in order to buy a product, two, which Shearing wanted, they did them together. And I would say this. Doesn't it lead to the presumption that they could have been buying off the generic from entering the market earlier? Well, two answers to that, Your Honor. First of all, I haven't finished the story yet. Go ahead. After the product was put on the table for Shearing to look at, and they had finished their clinical trial, so they were ready within months to file for FDA and NDA for FDA approval, Shearing did an evaluation of the product. They did sales projections for the product. They put those sales projections into their normal corporate model, and then they submitted the outcome of that, which was a net present value or economic value of between $225 million to $265 million. And they presented it to the board of directors with instructions that the board should approve it only if it stood on its own merit. And the board did that. And there was absolute, everything was documented. Everything was contemporaneous. And there was simply no evidence at all that there was anything nefarious about this. But in better answer or fuller answer, Your Honor, to your question, mediators all around the country, and we had an expert from the Harvard Project on Negotiation testify at our trial, and he explained that what makes cases impossible to settle is when it's a binary argument, and one side thinks they've got a good case, and the other side thinks they've got a good case, and you get into a Mexican standoff. You just can't settle the case. So what he recommends under all circumstances is try to take the discussion beyond the four corners of the dispute that's in litigation. Try to find something else that the parties can do that can get through this loggerhead. So that if we came up with a rule that made it... So you divide the market. I beg your pardon? In other words, so you allocate, I mean, what they ended up was an allocation of the market. Well, the Solicitor General... Which violates the antitrust law. No, Your Honor. The Solicitor General has just told us that if you have a patent and you compromise a legitimate patent lawsuit, that doesn't violate the patent laws at all or the antitrust laws. But that's the story with one additional thing that I should say, which is that counsel for the Solicitor General's office said that there was a summary judgment motion filed by us, a second ground for summary judgment based on the fact that there was no evidence in this case either that there was anything wrong with the license deal. And he said that had been denied. It has not been denied. It has not been passed on at all. You can read the opinion of the special master. It's very clear. He sets forth the contentions of the parties on all of the motions. So he doesn't have to decide that issue? He didn't have to. He just granted summary judgment on the other ground. But that's still pending. All right. And we would press that if for any reason this court decided to reverse. So let me move, Your Honor, into the order of the day, I think, which is what is it about? What are these reverse payment settlements? What is the track record on how they do and whether or not they are any competitive? And is there a basis for a presumption? The first thing I would like to point out, turn my page at the wrong time, is that the Solicitor General told the Supreme Court in an amicus brief several years ago, and I quote, reverse payments may have the salutary effect of facilitating efficient settlements that advance consumer welfare. That's the Solicitor General. That's the position that the government has taken, that these reverse payments can facilitate settlements that advance consumer welfare. Nobody claims they're per se illegal. Nobody on that side of the table. So we accept that. Yes. And I knew you did, Your Honor. But the fact that they believe that there are good reverse payment settlements is very important because we're going to have to come up with a rule that doesn't prevent those from happening. And the rule that the government has and the plaintiffs have offered is going to chill all settlements. Well, they say $60 million is a lot of money. Show us what you're adding in competition. I mean, if competition, if you can talk in terms of competition as units, and they may not agree to that, but it seems to me that what they're saying is it's a balance, and the balance is, you know, competition or not. What are you showing us? That was that sentence that I couldn't understand that I still don't, but go ahead. The next point I want to make, and I think it answers Your Honor's question, is what is the experience with reverse payment settlements? The antitrust laws put a lot more stock in experience than they do in theory or even logic. And the experience actually tends to refute the argument that you've just heard, and I'll tell you what that experience is. First, there is the famous case of the blockbuster drug Plavix. That was the subject of a reverse payment settlement that called for entry before the patent expired. The FTC vetoed that, which they had a right to do under a preexisting consent decree with Crystal Myers-Squith. They vetoed it. The parties went and tried the patent case, and the patent holder won, excluding the generic from the market until the day the patent expired. Example one, consumers did better under the reverse payment than they did under litigation. Example two, the ciprofloxacin case. That case was settled with a reverse payment and early entry, in other words, entry before the day the patent expired. Should we assume from that that the settlers thought that the patent might not withstand the challenge? I would assume that. I would assume that. I would assume that. These are, and one of the points that the cases have made is that the brand names are very, very risk averse. When Eli Lilly lost its Prozac patent case, the Federal Circuit held it invalid. Eli Lilly's market capitalization dropped $36 billion in one day. That's the kind of thing that gets CEOs fired. Shareholders and boards of directors can't deal with that. They can deal with settlements that provide certainty, and so the businessmen can plan to deal with a certain early entry. But in any event, that's, I'm getting to my second one, ciprofloxacin, settled with an early entry, large reverse payment, and then litigated the next three cases against the next three generics. Same issue in all four cases, patent validity, and the ciprofloxacin patent holder won all three cases and excluded those generics from the market until the day the patent expired. Tamoxifen, same thing. There's a slight wrinkle, which is that the Tamoxifen reverse payment settlement happened after a district court finding of invalidity. They settled that case with a reverse payment and immediate licensing. That wasn't a case where you kept the defendant in the patent suit off the market forever. They got to compete in the marketplace under a license. Then there were three subsequent generics who tried to come in under that patent. Tamoxifen manufacturers sued all of them and won all three, keeping them all out until the patent expired. What are we supposed to say? What's the general proposition? That I'm arguing for?